2023 IL App (1st) 211588-U

SECOND DIVISION
May 16, 2023

No. 1-21-1588

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Respondent-Appellee, | ) | Circuit Court of |
| | ) | Cook County. |
| v. | ) | |
| | ) | No. 10 CR 5302 |
| DWAYNE BAKER, | ) | |
| | ) | Honorable |
| Petitioner-Appellant. | ) | Ursula Walowski, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court. Justices Howse and Ellis concurred in the judgment.

**O R D E R**

¶ 1    *Held*:   The circuit court erred in dismissing three of the petitioner's ineffective assistance of trial and appellate counsel claims. The petitioner made a substantial showing that trial counsel was ineffective for failing to: (1) file a motion to suppress; (2) subpoena police and medical records that would have supported that motion; and (3) investigate, interview and present alibi witness testimony. Correspondingly, appellate counsel was ineffective for failing to raise these three issues on appeal. The circuit court properly dismissed the petitioner's remaining claims of ineffective assistance of trial and appellate counsels and prosecutorial misconduct.

¶ 2       After a jury trial in the circuit court of Cook county, the petitioner, Dwayne Baker, was convicted of attempted first degree murder and aggravated battery with a firearm and sentenced to 40 years' imprisonment. The petitioner now appeals from the second-stage dismissal of his petition filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). He contends that his petition should have been advanced to the third stage of postconviction proceedings where he made a substantial showing of: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; and (3) prosecutorial misconduct. For the following reasons, we affirm in part and reverse and remand in part.

¶ 3                                    I. BACKGROUND

¶ 4       The record before us reveals the following relevant facts and procedural history. In March 2010, the petitioner was charged with two counts of attempted first degree murder (720 ILCS 5/8-4(a), 720 ILCS 5/9-1(a)(1) (West 2010)) and one count of aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2010)) for shooting the victim, Robert Richardson. The petitioner proceeded with a jury trial at which the following evidence was adduced.

¶ 5       The victim, Robert, testified that he lived on the west side of Chicago and enjoyed fixing cars. Robert used to date the petitioner's mother and because of that relationship he had known the petitioner for over 20 years and had spoken to him often. He called the petitioner "Smokey."

¶ 6       According to Robert, on February 17, 2010, he received a telephone call from the petitioner asking for help getting into his car because he had locked the keys inside. Robert agreed to help, and once there, he gave the petitioner a clothes hanger to use on the car door. Robert held a flashlight and pointed it at the locked door, until the petitioner was able to get into his car and retrieve his keys. While the petitioner was inside his car, Robert observed him reaching under the

car's dashboard.

¶ 7    Robert testified that on the next morning, February 18, 2010, he went to his garage to work on his son's truck. Although Robert admitted to using heroin daily, and cocaine twice a week, he claimed that on that morning he did not use any drugs.

¶ 8    While at the garage, Robert received a telephone call from the petitioner who asked him where he was and then told him that he would be coming by. About 30 to 40 minutes later, at around 11 a.m. the petitioner arrived at the garage. Robert's son, Marco, was also present.

¶ 9    Robert was standing next to his son's truck, working underneath the hood, when he heard the petitioner ask "[W]here my shit at [?]" Robert turned around, but before he could respond, the petitioner pulled out a 9-millimeter gun from his belt and shot him in the pelvis. The impact knocked Robert off the truck and onto the floor. The petitioner walked over to where Robert was lying on his back, and standing at his feet, extended his arm and shot him in the chest.

¶ 10    Robert averred that although he was conscious when the police and paramedics arrived, he was in too much pain to answer any questions. He also denied speaking to hospital personnel prior to surgery. Robert first spoke to the police two days later and identified the petitioner as the shooter. He also identified the petitioner from a photo array.

¶ 11    On cross-examination, Robert acknowledged that he was present in court pursuant to a subpoena and warrant, and that he had previously not come to court twice. He also admitted that in 2012, two years after the shooting, he told two State's Attorneys that the person who shot him was wearing a mask. On redirect, however, Robert explained that he had lied because he was afraid for his life and did not know "how to get protection."

¶ 12    Robert's son, Marco Richardson, who appeared at trial in an Illinois Department of Corrections (IDOC) tracksuit, next testified that he was serving a four-year sentence for possession

of a controlled substance and that he had numerous prior felony drug convictions, but that the State had not offered him anything in exchange for his testimony at the petitioner's trial.

¶ 13    Marco testified that he has known the petitioner for 20 years and that he calls him "Smoke." On the day of the shooting, Marco ran into the petitioner, who asked him about Robert's whereabouts. When Marco told the petitioner that he did not know where his father was, the petitioner informed him that Robert had stolen his car radio and his money and that if they were not returned, he was going to kill Robert.

¶ 14    Marco stated that after looking for Robert himself, he eventually went to Robert's garage. He was sitting in the front passenger seat of his truck, which was parked inside the garage, facing forward, while Robert was working underneath the hood, when he saw the petitioner arrive in his car from the back alley. The petitioner, who was wearing jeans and a white t-shirt got out of his car, approached the passenger side of Marco's truck, and asked Robert about the radio. According to Marco, the petitioner then pulled out a gun and shot Robert, who fell to the floor. The petitioner shot Robert again, this time in the chest. Marco testified that he saw the petitioner turn, get into his car and drive off before he called 911. Marco could not recall how many shots were fired but believed it was three or four. When asked how he was able to observe what was happening from inside his truck when the hood was raised, Marco stated that there was a "crack in the hood" through which he could see.

¶ 15    Marco admitted that when the police initially interviewed him at the scene, he told them that he could not identify the shooter because he was wearing a black hood and mask. Marco acknowledged that he initially lied to the police because he planned to handle the situation himself and take revenge on the petitioner. An hour later, however, when he spoke to the police at the hospital, Marco told them that the petitioner had shot his father and identified the petitioner from

a photo array. Marco explained that he changed his mind because he had been "doing good" since his release from prison and did not want anymore "trouble."

¶ 16    On cross-examination, Marco admitted that he did not tell the police about the threat the petitioner had made against his father earlier in the day because he believed it to be untrue. He explained that his father was known and well-respected in the neighborhood and that he did not believe that the petitioner would follow through on his promise.

¶ 17    Marco also admitted to telling the first officer at the scene, Chicago Police Officer Lewis Montes, that he could not provide a description of the shooter because the shooter was unknown to him. He denied, however, making this same statement to the 911 operator.

¶ 18    On cross-examination, Marco could not recall whether he told Officer Montes that the shooter was wearing all black clothing. He also admitted that he never told Officer Montes that he observed the shooting through a crack in his hood. While Marco initially denied that he told Officer Montes that he observed the shooter through his passenger side mirror, because that was impossible since "[the petitioner] was looking backwards," he subsequently claimed that he could "see him coming in the garage right through the mirror." Marco further admitted that contrary to his testimony at trial, he could not recall whether he told Officer Montes that he did not see where the shooter went after he shot Robert because he was attending to his father.

¶ 19    Chicago Police Detective Roger Lara next testified that together with his partner Detective Eric Reyes, he was assigned to investigate Robert's shooting. After initially speaking to Marco at the garage, the two detectives proceeded to Mount Sinai Hospital where Robert was being treated. After speaking with Marco at the hospital, the detectives learned the identity of the shooter and compiled a photo array with the petitioner's photograph. Marco was shown that photo array and

"immediately" identified the petitioner as the shooter.

¶ 20    Detective Lara acknowledged that the detectives were unable to speak to Robert on February 18, 2010, because he "was listed in critical condition" and "was being treated by medical staff at the hospital." The detectives were similarly unable to speak to Robert on February 19, 2010, because he was intubated and sedated. They finally interviewed him on February 20, 2010, whereupon Robert recounted what had happened and identified the petitioner as the man who shot him.

¶ 21    Detective Lara next testified that on March 2, 2010, pursuant to an "investigative alert," the petitioner was taken into custody. Detective Lara spoke to the petitioner at the police station. After reading the petitioner his *Miranda* rights, Detective Lara asked the petitioner if he knew Robert. The petitioner told the detective that he knew Robert for 20 years and that he had sold him drugs off and on in the past. Detective Lara asked the petitioner if he had seen Robert lately, and the petitioner acknowledged that he had asked Robert for help in getting into his car because he had inadvertently locked his keys inside. The petitioner further stated that Robert agreed to help him and brought pry tools. However, the petitioner did not allow Robert to use the pry tools because he was worried that they would damage his car. Instead, he used a wire hanger, while Robert held up a flashlight so that he could see. The petitioner told the detective that he was able to get into his car and that when he did, he "put some drugs underneath the dash and he closed the vehicle back up." Robert then asked him if "he was going to leave the face plate of the radio in the car." The petitioner responded "yes," and they both left the area.

¶ 22    The petitioner told the detective that when he returned several hours later, he noticed that his radio and drugs were missing and "immediately assumed" that Robert had broken into his car. He explained that Robert had seen him place the drugs in the car, and "there were pry marks in the

6

exact location where Robert was going to attempt to enter." When the petitioner found Robert the next morning, he confronted him, but Robert denied having the drugs and money and told the petitioner to "get away from him."

¶ 23    On cross-examination, Detective Lara stated that he could not recall whether he asked the petitioner to sign a *Miranda* waiver prior to their conversation at the police station. In addition, the detective admitted that after their conversation, he did not ask the petitioner to memorialize his statement in writing or to review the detective's notes. Finally, detective Lara admitted that during their conversation, the petitioner denied shooting Robert and stated that he had nothing to do with the shooting.

¶ 24    Chicago Police Officer Lawrence Odomos next testified that in 2010 he was assigned to the Fugitive Apprehension Unit and oversaw the "investigative alert" issued for the petitioner. As part of his investigation, Officer Odomos left his contact information with the petitioner's family and friends. On March 2, 2010, he received a telephone call from the petitioner, and the two of them agreed to meet at a gas station in Chicago. Officer Odomos testified that when the petitioner arrived at the gas station, he placed him under arrest.

¶ 25    On cross-examination, Officer Odomos confirmed that the petitioner was the one who contacted him and agreed to meet him at the gas station. He further admitted that the petitioner did not attempt to run away when he tried to place him under arrest, and that he was cooperative "at all times."

¶ 26    The parties next entered into several stipulations including, that: (1) two 40-caliber shell casings fired from the same gun were recovered from the scene of the crime; (2) Robert had a felony conviction for possession of a controlled substance; and (3) Marco had several felony convictions for possession of a controlled substance with intent to deliver. The parties further

stipulated to the lengthy and detailed medical testimony of Dr. Ryan Sullivan, the surgeon who treated Robert after the shooting. This stipulation described the medical procedures that were performed on Robert when he arrived at the hospital. Relevant to this appeal, it established that Robert was shot twice: once in the thigh and once in the chest below the right nipple, with an exit wound on the lower back.

¶ 27    After the State rested, the petitioner called Detective Lara's partner, Chicago Police Detective Reyes. Detective Reyes acknowledged that he spoke to Marco at the garage immediately after the shooting. He admitted that during that conversation Marco told him that he was in his truck with the radio on when the shooter arrived and that he did not hear the shooter say anything before firing at Robert. Instead, Marco told the detective: "The guy didn't say anything. He just started to shoot." Marco also told the detective that he did not see where the shooter fled because he was checking on his father.

¶ 28    After the petitioner rested, the parties proceeded with closing arguments. The State asserted that two eyewitnesses had identified the petitioner as the shooter and testified consistently to the details of the crime. The State argued that while Robert could not immediately tell anyone who shot him because he was in an incredible amount of pain, two days after the shooting, when he was able to speak, he identified the petitioner as the shooter and picked his photograph from a photo array. The State similarly contended that, while Marco originally told the police that the shooter was wearing a mask, he did so because he lived in a world of "mistrust and violence" where people took the law into their own hands. Ultimately, the State argued, Marco came to his senses and decided to let the police do their job.

¶ 29    In response, defense counsel argued that neither Marco nor Robert were believable witnesses. With respect to Marco, defense counsel pointed out that regardless of what kind of

world you lived in there were "certain principles" that everyone followed, one of which was that if your father gets shot, you do not lie to 911 and the police, and you do not make up the description of the shooter and say that he was wearing a mask when he was not. With respect to Robert, defense counsel argued that he was a drug addict who had contact with "all sorts of unsavory characters," and that he "showed up" for court only after a warrant was issued for his arrest.

¶ 30    Defense counsel next pointed out that in contrast to Marco and Robert, the petitioner's actions in contacting Officer Odomos, agreeing to meet with him at the gas station, and subsequently making a statement to the police, were evidence of an "innocent person" who "believe[d] in the system." Counsel further argued that, apart from Marco's and Robert's inconsistent testimonies, there was no evidence whatsoever linking the petitioner to the crime.

¶ 31    In rebuttal, the State argued that the only evidence the jury needed was the testimony of the two eyewitnesses, and that if they believed Robert and Marco, they should find the petitioner guilty. The State further argued that if the jury had any doubt about the inconsistencies in Robert's and Marco's testimonies, they should look to the petitioner's near confession as proof of his guilt. As the State asserted:

> "Once the [petitioner] is arrested, he speaks to police. And that is how you know for a fact that Rob[ert] and Marco *** are telling the truth because just about every single thing the [petitioner] tells the police is exactly what Rob[ert] and Marco told the police and what they told you.
>
> ***
>
> The [petitioner] tells the police I hid drugs under the dashboard. That's what Rob[ert] said. *** [T]hen the [petitioner] gives information to the police that only the [petitioner] would know[,] which is that he went back to his car and the drugs[,] *** were missing.

9

So, the [petitioner] believes that Rob[ert] stole his stuff, and he tells the police that. I believe Rob[ert] *** stole my stuff, so I went looking for him. Those are his words. That is what [the petitioner] told the police. That's what we call motive, ladies, and gentlemen.

\*\*\*

The other extremely telling piece of information that proves the [petitioner] is guilty is that according to his own words he puts himself at the scene of the shooting the day of the shooting with Rob[ert] ***. The [petitioner] tells police, I went looking for him. I found Rob[ert] at 14th and Tripp. I said to him, I want my stuff back. And [Robert] said, I don't know what you're talking about. Get away from me. He puts himself there. *The [petitioner] essentially confessed to this crime ***.*"

¶ 32 Moreover, relevant to this appeal, in rebuttal the State made three additional comments to which defense counsel objected, but the circuit court permitted to stand. First, the State reiterated that Robert was unable "to be interviewed or spoken to by anyone," for two days after the shooting because he was "practically dying" from a chest wound, had been operated on twice, and was "unconscious" for two days "with a tube down his throat." Second, the State argued that Robert had changed his "version of events" because he had been "threatened on the street," but "finally" found the courage to come to court and tell the truth. Third, the State argued that there was no physical evidence linking the petitioner to the crime because the petitioner "controlled the crime scene" and took the gun with him.

¶ 33 After closing arguments, the jury retired to deliberate. During their deliberations, defense counsel asked to note several things for the record. First, counsel objected to the State's argument that Robert said he was "threatened on the street." The court responded that Robert testified that he was afraid for his life and that the "logical inference" was that he was threatened, although "not

necessarily" by the petitioner. Defense counsel then objected to the State's contention that Robert could not speak for two days after the shooting. According to defense counsel, the parties had previously "worked out" a stipulation indicating that Robert had spoken during that time, and consequently, it was improper for the State to imply that he could not speak for "two days straight." The court asked whether that stipulation was part of the record. When defense counsel indicated that it was not, the court advised counsel not to talk about a stipulation that was not part of the record. Defense counsel responded that the State was aware that Robert could speak, yet elicited testimony that he could not, which was "possibly" prosecutorial misconduct. The court replied that it could only rule on objections based upon the evidence that it heard, not the evidence that defense counsel wished the court had heard.

¶ 34    After deliberations, the jury found the petitioner guilty of attempted first degree murder and aggravated battery with a firearm.

¶ 35    The petitioner then filed a twenty-seven paragraph posttrial motion. In addition, defense counsel informed the court that the petitioner wished to file a motion alleging her ineffectiveness. The court told the petitioner to talk to his defense counsel and that he could file his motion at a later date.

¶ 36    Relevant to this appeal, at the subsequent hearing on the petitioner's motion for a new trial, defense counsel argued that the State committed prosecutorial misconduct when it argued in closing: (1) that Robert was unconscious two days after the shooting; and (2) that he was subsequently threatened. With respect to Robert's ability to speak at the hospital, counsel maintained that the State had argued facts that it knew to be false when it stated that Robert could not communicate with anyone for two days after the shooting. Once again, counsel pointed out that the parties had entered into a stipulation that if Robert "failed to mention that he used heroin

every day," they would stipulate that Robert told an anesthesiologist that he used heroin, which indicated that he could speak at the hospital. Counsel did not enter the stipulation into evidence because Robert admitted his drug use, but believed that "[i]n retrospect" she should have put it in. Counsel pointed out that this was an issue that the petitioner could later argue regarding her representation. The court held that it could only attempt to correct issues that occurred at trial, "not something that somebody thought about beforehand." Defense counsel responded that "obviously" she was not alleging her own ineffectiveness, but that she wanted "the next court" to be aware of the stipulation. The court, however, reiterated that there was no stipulation in the record.

¶ 37    Defense counsel also argued that it was improper for the State to tell the jury that Robert was threatened. The court disagreed, concluding that such a statement was a reasonable inference based upon Robert's testimony that he was afraid for his life and did not know where he was going to get protection.

¶ 38    After the circuit court denied the petitioner's motion for a new trial, the parties proceeded with sentencing. The circuit court merged the aggravated battery with a firearm conviction into the attempted murder conviction and sentenced the petitioner to 40 years' imprisonment (15 years on the attempted murder plus the mandatory 25-year firearm enhancement for his personal discharge of the firearm during the commission of the offense).

¶ 39    The petitioner appealed his conviction and sentence. On direct appeal, he asserted that he was denied his right to a fair trial when in closing the State argued facts that it knew to be false, *i.e.*, that Robert could not communicated immediately after the shooting. The petitioner further contended that pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984) his case should be remanded for an additional inquiry into his posttrial claim of ineffective assistance of trial counsel because the circuit court failed to adequately inquire into the stipulation that defense counsel admittedly

failed to enter. In addition, the petitioner argued that his *mittimus* should be corrected to reflect the exact number of days he spent in presentence custody. On appeal, we corrected the petitioner's *mittimus* but affirmed his conviction and sentence in all other respects. *People v. Baker*, 2015 IL App (1st) 130016-U.

¶ 40 We held that to the extent there was any indication that Robert could speak during the two days after the shooting, "it merely indicated that [Robert] was able to speak to hospital personnel in order to facilitate his treatment, it did not indicate that he spoke to police but was unable to identify [the petitioner] as the shooter, and does not contradict the State's argument that [Robert] identified [the petitioner] to the police as soon as [he] could, *i.e.,* when he was no longer intubated and could speak." *Id*. ¶ 18. In addition, with respect to the petitioner's *Krankel* argument, we held that defense counsel never admitted that her failure to admit the alleged stipulation into evidence denied the petitioner effective representation, and that the petitioner never expressed displeasure with counsel's actions during the trial. *Id*. ¶ 25.

¶ 41 On July 30, 2016, the petitioner filed the instant postconviction petition. After the petition was advanced to the second stage, postconviction counsel filed an amended petition on September 20, 2020, alleging trial counsel's ineffectiveness for the following reasons: (1) failure to file a motion to suppress the petitioner's inculpatory statements to the police; (2) failure to subpoena police and medical records, which confirmed that the petitioner suffered from several seizures while in custody; (3) failure to subpoena Oak Park Police records, which confirmed the petitioner's post-shooting possession of the radio faceplate, whose alleged theft by Robert motivated the petitioner's shooting; (4) failure to investigate, interview, or present the testimony of alibi witness Belinda Watson-Perry; (5) failure to submit the negotiated stipulation of Mt. Sinai Hospital anesthetist Harmony Szymanski and to call her as a witness; (6) agreeing to a confusing and largely

irrelevant medical stipulation by Dr. Sullivan and failure to call Dr. Sullivan as a witness to clarify the parts of his stipulated testimony that contained significant, but overlooked, statements impeaching Marco and Robert; (7) failure to perfect the impeachment of Marco's testimony with police reports and to introduce his prior inconsistent statements as substantive evidence; (8) failure to call Officer Montes, whose testimony would have contradicted the testimonies of Marco, Robert, and Detective Lara; and (9) failure to challenge the petitioner's firearm enhancement under *Apprendi v. New Jersey,* 530 U.S. 466 (2000).

¶ 42    The petitioner also alleged that his appellate counsel was ineffective for failing to raise the aforementioned ineffective assistance of trial counsel claims on direct appeal and for failing to challenge the sufficiency of the evidence to convict him.

¶ 43    On February 3, 2021, the petitioner filed a supplemental postconviction petition additionally alleging that he was denied his right to a fair trial where the State committed prosecutorial misconduct by arguing facts that were not in evidence, the objection to which was overruled by the circuit court.

¶ 44    In support of his claims, the petitioner attached numerous documents, including, *inter alia*: police reports, medical records and affidavits by himself, Belinda Watson-Perry, and his trial counsel, Abigail Clough.

¶ 45    In his affidavit, the petitioner averred that in the early morning hours of 12:30 or 1 a.m. on February 18, 2010, he was using a coat hanger and trying to open his car door with it because he had locked himself out when Robert approached him and offered to help. The petitioner told Robert that he did not need help because he had already managed to get the car open. The petitioner took the key out of the ignition and reached under the dashboard to switch off the cut-off switch. Robert

then left and the petitioner did not see him again until the trial.

¶ 46    The petitioner averred that on February 18, 2010, his car did not have a radio in the dashboard because it had been removed for repair. At the time the petitioner was trying to open the car to retrieve his keys, the radio was in the trunk of the car. According to the petitioner, no one stole the radio, and he never accused anyone of stealing it.

¶ 47    The petitioner further attested that later that morning, at about 8:30 a.m., he called Belinda and asked her out to brunch. She agreed and picked him up in her car near the Moo and Oink grocery store at about 9:15 a.m. The two of them then went to the Golden Corral restaurant and remained there between about 10 a.m. and 2 p.m. Afterwards, they went to the Sportsman Inn where they spent the night together.

¶ 48    The petitioner further attested that a few days later, his mother informed him that the police had been at her house and were looking for him. The petitioner's mother telephoned him again a few weeks later and told him that Detective Odomos wanted to speak with him. She gave the petitioner the detective's phone number. On March 1, 2010, the petitioner called Detective Odomos and told him that he would be happy to speak with him, and the two agreed to meet the following day.

¶ 49    In his affidavit, the petitioner next attested that he has long suffered from a seizure disorder, and that he takes medication for it but that the medication does not always help. On March 1, 2010, sometime after he spoke to Detective Odomos on the telephone, the petitioner was traveling through Oak Park in his car when he suffered a seizure, which caused him to crash into several parked cars. After he was arrested by Oak Park Police and charged with traffic offenses, he was taken to Loretto Hospital where he was treated for the seizure.[1] After the Oak Park police officers

---

[1] Those hospital records are attached to his petition and confirm that the petitioner suffered a seizure.

spoke to Detective Odomos, the petitioner was released on an I-bond.

¶ 50    The next morning, on March 2, 2010, Belinda drove the petitioner to meet Detective Odomos. The petitioner's father was with them. When Detective Odomos arrived at the gas station, he told the petitioner that he was not under arrest but that he wanted to ask the petitioner some questions. The petitioner's father and the petitioner then accompanied Detective Odomos to the police station in the detective's car. When they arrived at the station, Detective Odomos asked the petitioner's father to wait downstairs while he took the petitioner to an upstairs room. The petitioner stated that he was alone in the room for about an hour and that while waiting there he had another seizure. The petitioner averred that when Detective Odomos returned, he told him that he was not feeling well and that he "would need to do this another day." Detective Odomos informed the petitioner that he would have to wait for other detectives to arrive and then locked the petitioner in the room again. While the petitioner waited, he continued to have mild seizures.

¶ 51    The petitioner attested that when the other detectives finally arrived, he felt weak and sick and had difficulty focusing on what they were saying. After he was read his *Miranda* rights and signed a paper agreeing to speak with the police, the detectives introduced themselves and someone from the State's Attorney's Office. The petitioner asked the detectives "Didn't he say I don't have to answer questions without my attorney being present?" When the detectives indicated that that was correct, the petitioner told them he had nothing to say without his attorney, and the detectives left.

¶ 52    According to the petitioner, after a while, Detective Lara returned and said he wanted to ask the petitioner some basic questions for which he did not need an attorney. The petitioner told Detective Lara that he did not want to speak with him and needed medical treatment because he kept having seizures and could "barely stay alert." Detective Lara responded that the petitioner

16

would get medical treatment "as soon as [he] cooperated." He then locked the petitioner in the room once more.

¶ 53    The petitioner stated that Detective Lara subsequently informed him that he was going to be kept in the police station overnight for a lineup. The petitioner was permitted to give his personal belongings to his father and was then placed in a cell. While in lockup, the petitioner had another seizure and "was apparently taken to the hospital because, when [he] became fully conscious, [he] was being transported back from the hospital" to the lockup.[2]

¶ 54    In his affidavit, the petitioner further attested that prior to trial he informed his defense counsel that he had been suffering from seizures while in police custody and that he had asked the detectives for an attorney while being questioned. The petitioner also averred that he repeatedly asked his defense counsel to file a motion to suppress his alleged statement to the police, but that counsel refused because, according to her, the statement was "harmless."

¶ 55    In addition, the petitioner averred that prior to trial, he informed his defense counsel that Belinda could testify that he was having brunch with her at the Golden Corral restaurant when Robert was shot, but that counsel told him that Belinda's testimony was not important because they had no receipts from the restaurant or the hotel they visited after brunch. The petitioner suggested to his defense counsel that she send an investigator to the Golden Corral restaurant and the Sportsman Inn because he believed that both places had video camera systems that would have recorded them, but defense counsel refused.

¶ 56    The petitioner also averred that he wanted to testify at trial, but that defense counsel advised him not to because she did not prepare him, and he would "mess up her case since she had

---

[2] These medical records are also attached to the petition and confirm that the petitioner was treated at the hospital after he lost consciousness following a seizure.

discredited the State's witnesses and that was all the jury had to go on."

¶ 57    In her affidavit, Belinda averred that after receiving a call from "Smokey" at about 8:30 a.m. on February 18, 2010, she picked him up from the 4800 block of Madison Street by the Moo and Oink grocery store. From there, they went to the Golden Corral restaurant in Bolingbrook. They arrived at the restaurant at about 10 a.m. and did not leave until about 2 p.m. Belinda stated that from there they went to the Sportsman Inn on Cicero Avenue and 37th Street, where they spent the night together. The next morning, at about 8 a.m. she dropped "Smokey" off at the corner of 13th Street and Tripp Avenue.

¶ 58    In her affidavit, the petitioner's trial counsel, Cook County Assistant Public Defender (APD) Abigail Clough, attested that during discovery in the petitioner's case, she received various medical records pertaining to Robert's treatment after the shooting. Included in these records was a document purporting to be notes from an interview by Mount Sinai anesthetist Harmony Szymanski. Because the notes contained what appeared to be certain statements by Robert, which APD Clough believed would be useful in impeaching him, she contacted Szymanski and discussed the notes with her. Szymanski confirmed the notes were from her interview with Robert.

¶ 59    APD Clough further attested that she subsequently contacted the State's Attorneys prosecuting the petitioner's case and informed them of what she had discovered. She then suggested that they contact Szymanski if they had any questions and provided them with Szymanski's contact information. APD Clough attested that she was later informed by the State's Attorneys that they had no objection to a stipulation regarding Szymanski's testimony. APD Clough prepared a written stipulation, which she showed to the State's Attorneys, and they verbally agreed to it but did not sign it.[3] The stipulation was therefore never entered into the

---

[3] The actual stipulation is not part of the record on appeal, because, as APD Clough attested in her affidavit, without a court order and pursuant to the Health Insurance Portability and Accountability Act (HIPPA) she was not permitted

evidence.

¶ 60    On April 29, 2021, the State filed a motion to dismiss asserting that the postconviction petition had failed to make a substantial showing of ineffective assistance of trial and appellate counsels and prosecutorial misconduct.

¶ 61    On November 8, 2021, the circuit court entered a written order granting the State's motion. The court found that the petitioner's claims regarding trial counsel's ineffectiveness could have been, but were not, addressed on direct appeal and were therefore forfeited. The court further found that the petitioner's claims regarding prosecutorial misconduct were already raised and rejected on direct appeal and were therefore barred by *res judicata*. For "the sake of argument," the court then addressed each one of the petitioner's contentions and found that none had merit because the petitioner had failed to make a substantial showing that he was prejudiced by any purportedly deficient performance by either trial or appellate counsels. The circuit court further found that all the statements made by the prosecutor in closing argument were proper and that the petitioner was not substantially prejudiced by them. The petitioner now appeals.

¶ 62                                II. ANALYSIS

¶ 63    On appeal, the petitioner contends that dismissal of his petition was improper because he made a substantial showing of: (1) ineffective assistance of trial counsel; (2) ineffective assistance of appellate counsel; and (3) prosecutorial misconduct. For the following reasons, we find that the petitioner has only made a substantial showing of ineffective assistance of trial and appellate counsels on three grounds.

¶ 64    At the outset, we note the familiar principles regarding postconviction proceedings. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2016)) provides a means by

---

to discuss Robert's medical records and treatment.

which a criminal defendant may challenge his conviction on the basis of a "substantial deprivation of federal or state constitutional rights." *People v. Tenner*, 175 Ill. 2d 372, 378 (1997); *People v. Cotto*, 2016 IL 119006, ¶ 26; *People v. Tate*, 2012 IL 11214, ¶ 8; *People v. Hodges*, 234 Ill. 2d 1, 9 (2009); *People v. Peeples*, 205 Ill. 2d 480, 509 (2002). A postconviction proceeding is not an appeal from the judgment of conviction but is a collateral attack on the trial court proceedings. *Tate*, 2012 IL 11214, ¶ 8; see also *People v. Kokoraleis*, 159 Ill. 2d 325, 328 (1994) (noting that a postconviction action "is not a substitute, or an addendum to, direct appeal.") Accordingly, issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised, but were not, are forfeited. *Tate*, 2012 IL 11214, ¶ 8; *People v. English*, 2013 IL 112890, ¶ 22.

¶ 65　　The Act provides a three-stage process for postconviction relief. *Cotto*, 2016 IL 119006, ¶ 26; see also *People v. Johnson*, 2017 IL 120310, ¶ 14. At the first stage of the proceedings, the circuit court must independently review the petition and determine whether the allegations therein, taken as true, demonstrate a constitutional violation or whether they are frivolous or patently without merit. *Cotto*, 2016 IL 119006, ¶ 26; 725 ILCS 5/122–2.1(a)(2) (West 2016); *Tate*, 2012 IL 112214, ¶ 9. If the circuit court affirmatively determines that the petition is neither frivolous nor patently without merit or if it takes no action on the petition within 90 days after the petition is filed and docketed, the petition must be advanced to the second stage. *Cotto*, 2016 IL 119006, ¶ 26.

¶ 66　　At the second stage of postconviction proceedings, such as here, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a violation of constitutional rights. 725 ILCS 5/122-6 (West 2016); *Tate*, 2012 IL 11214, ¶ 10; *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006); see also *People v. Edwards*, 197 Ill. 2d 239, 246

(2001). In doing so, the court must not engage in fact-finding or credibility determinations but must take as true all well-pleaded facts that are not positively rebutted by the original trial record. *People v. Domagala*, 2013 IL 11368, ¶ 35; *People v. Sanders*, 2016 IL 118123, ¶ 42; see also *People v. Towns*, 182 Ill. 2d 491, 501 (1998) ("In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits are taken as true."); see also *People v. Plummer*, 344 Ill. App. 3d 1016, 1020 (2003) ("The Illinois Supreme Court *** [has] recognized that factual disputes raised by the pleadings cannot be resolved by a motion to dismiss at either the first stage *** or at the second stage *** [of postconviction proceedings], rather, [they] can only be resolved by an evidentiary hearing"); see also *People v. Coleman*, 183 Ill. 2d 366, 380-81 (1998) ("[O]ur past holdings have foreclosed the circuit court from engaging in any fact-finding at a dismissal hearing because all well-pleaded facts are to be taken as true at this point in the proceeding."); see also *People v. Dupree*, 2018 IL 122307, ¶ 29 ("The substantial showing of a constitutional violation that must be made at the second stage is 'a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief.' (Internal citations omitted.)").

¶ 67    To determine whether averments are positively rebutted by the record, the inquiry is whether it is clear from the trial record that no fact finder could ever accept the truth of the averments. See *People v. Robinson*, 2020 IL 123849, ¶ 60; *People v. Simms*, 2021 IL App (1st) 161067-B, ¶ 28. Contradictions between the petitioner's averments and the trial evidence are not enough, because recognizing the existence of a conflict with the trial evidence is not the same as finding that the averments are positively rebutted. See *Simms*, 2021 IL App (1st) 161067-B, ¶ 35

(citing *Robinson*, 2020 IL 123849, ¶ 60).

¶ 68    Accordingly, where no substantial showing of a constitutional violation is made, the petition is dismissed. *Tate*, 2012 IL 11214, ¶ 10. If, however, a substantial showing of a constitutional violation is set forth, the petition must be advanced to the third stage for the circuit court to conduct an evidentiary hearing. *Tate*, 2012 IL 11214, ¶ 10. Our review of the circuit court's dismissal of a postconviction petition at the second stage is *de novo*. *Tate*, 2012 IL 11214, ¶ 10; *Pendleton*, 223 Ill. 2d at 473.

¶ 69                              A. Ineffective Assistance of Trial Counsel

¶ 70    On appeal, just as in his petition, the petitioner makes eight separate claims of ineffective assistance of trial counsel. He contends that counsel: (1) failed to file a motion to suppress his inculpatory statements to the police; (2) failed to subpoena medical and police records, which established that he suffered several seizures while in police custody; (3) failed to subpoena Oak Park Police records, which confirmed his post-shooting possession of the radio faceplate, whose alleged theft by Robert motivated the shooting; (4) failed to investigate, interview, or present alibi witness testimony from Belinda; (5) failed to submit the negotiated stipulation of nurse Szymanski regarding Robert's ability to speak while at the hospital; (6) agreed to the confusing and irrelevant medical stipulation of Dr. Sullivan regarding Robert's treatment, and failed to call Dr. Sullivan as a witness to clarify the parts of his stipulated testimony that could have impeached Marco and Robert; (7) failed to perfect Marco's impeachment with police records or the testimony of Officer Montes and to request a jury instruction regarding prior inconsistent statements; and (8) failed to challenge the petitioner's firearm sentencing enhancement pursuant to *Apprendi,* 530 U.S. 466. In addition, the petitioner contends that the cumulative effect of trial counsel's deficient performance prejudiced the outcome of his trial. We address each of the

petitioner's contentions in turn.

¶ 71    It is axiomatic that every criminal defendant has a constitutional right to effective representation of counsel. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668, (1984); see also *People v. Lacy*, 407 Ill. App. 3d 442, 456 (2011); see also *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland* )). Under that two-prong test, a petitioner must establish both: (1) that his counsel's conduct fell below an objective standard of reasonableness under prevailing professional norms; and (2) that he was prejudiced by counsel's conduct, *i.e.*, that but for counsel's deficient performance, there is a reasonable probability that the result of his proceeding would have been different. See *Lacy*, 407 Ill. App. 3d at 456; see also *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94); see also *Domagala*, 2013 IL 113688, ¶ 36. Failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. See *People v. Henderson*, 2013 IL 114040, ¶ 11; see also *People v. Patterson*, 217 Ill. 2d 407, 438 (2005).

¶ 72    Under the first *Strickland* prong, the petitioner must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy. *Lacy*, 407 Ill. App. 3d at 456-57. Under the second *Strickland* prong, "a reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome--or put another way, that counsel's deficient performance rendered the result of [the proceedings] unreliable or fundamentally unfair." *People v. Evans*, 209 Ill. 2d 194, 220 (2004);

see also *Plummer*, 344 Ill. App. 3d at 1019 (citing *Strickland*, 466 U.S. at 694).

¶ 73    Where, as here, we are tasked with reviewing the second-stage dismissal of a petition alleging ineffective assistance of trial counsel, we determine whether the petition has made a substantial showing under the two-prong *Strickland* ineffectiveness test. *People v. Alberts*, 383 Ill. App. 3d 377-78 (2008).

¶ 74                    1. Failure to File a Motion to Suppress

¶ 75    On appeal, the petitioner first asserts that defense counsel was ineffective because she failed to file a motion to suppress his statements to the police. Specifically, the petitioner argues that his documented medical condition (*i.e.*, his continued seizures) and his repeated requests for counsel during his custodial interrogation rendered any alleged waiver of his *Miranda* rights, during that interrogation, involuntary. He therefore contends that counsel's failure to file and argue a motion to suppress was objectively unreasonable and prejudiced the outcome of his trial.

¶ 76    The State, on the other hand, contends that counsel's decision not to file a motion to suppress was strategic because the petitioner's statements were exculpatory, and counsel used them as evidence of the petitioner's cooperation with the police. The State therefore argues that the introduction of the petitioner's statements at trial in no way prejudiced the verdict. For the following reasons, we disagree with the State.

¶ 77    While the decision to file a motion to suppress is generally a matter of trial strategy and not a basis for an ineffective assistance of counsel claim, the failure to file a motion to suppress statements may constitute ineffective representation if "there is some indication that the statements were truly involuntary." *People v. Brickhouse*, 2021 IL App (3d) 150807, ¶ 40. To show that a decision to forego filing a motion to suppress amounted to ineffective assistance, the petitioner must demonstrate that the failure prejudiced him. *People v. Woodard*, 367 Ill. App. 3d 304, 312

(2006). To establish prejudice, the petitioner must show that: (1) the motion to suppress was meritorious; and (2) there is a reasonable probability that the verdict would have been different absent the excludable evidence. *Henderson*, 2013 IL 114040, ¶ 15. In other words, if the motion would not have been futile, defense counsel's failure to file it establishes her incompetence. *Id*.

¶ 78     In the present case, taking as we must, the unrebutted allegations in the petitioner's pleadings, as true, we find that the petitioner has made a substantial showing that his statements to the police were made involuntarily, and that therefore trial counsel's decision not to file a motion to suppress was unreasonable and prejudiced the outcome of his trial.

¶ 79     The fifth amendment of the United States Constitution (U.S. Const., amend. V) and article I, section 10, of the Illinois Constitution (Ill. Const. 1970, art. I § 10) guarantee that "[n]o person *** shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona*, 384 U.S. 436, 475-77 (1966), the United States Supreme court extended the fifth amendment privilege against self-incrimination to custodial interrogations and required that an accused be warned that he has the right to remain silent, he has a right to an attorney, and that any statement given may be used against him in the court of law. See also *People v. Winsett*, 153 Ill. 2d 335, 348.

¶ 80     It is axiomatic that under *Miranda*, a custodial statement is inadmissible at trial, unless the State demonstrates, by a preponderance of the evidence, that the statement was preceded by the accused's: (1) voluntary, knowing, and intelligent wavier of his right not to be compelled to testify against, or incriminate, himself; and (2) his waiver of the right to have an attorney present during the interrogation. *Miranda*, 384 U.S. at 444; see also *People v. Buschauer*, 2022 IL App (1st) 192472, ¶ 65; *People v. Soto*, 2017 IL App (1st) 140893, ¶ 69; *People v. Cook*, 352 Ill. App. 3d

108, 120 (2004).

¶ 81 Where, as alleged here, after being *Mirandized*, the accused invokes his right to counsel, the police must stop the interrogation until an attorney can be present and may not reapproach him for further interrogation until counsel is made available to him. *Edwards v. Arizona*, 451 U. S. 477, 484-85 (1981); *Miranda*, 384 U.S. at 444-45; *Winsett*, 153 Ill. 2d at 349. This bright-line rule was first established by the United States Supreme Court decision in *Edwards*, 451 U.S. at 484-85. In that case, the defendant requested counsel during an interrogation and the police ceased their questioning but returned the next day telling the defendant that they wanted to talk to him. *Id*. at 479. After the officers read the defendant his *Miranda* warnings again, the defendant agreed to speak with them, but it was not clear what prompted him to do so. *Id*. The Supreme Court held that the defendant's subsequent statement was obtained in violation of his fifth amendment right to counsel in that once the defendant asserted his right to counsel all questioning must cease until counsel is obtained. *Id*. at 484-85.

¶ 82 The underlying rationale of this rule is well established. By invoking the right to an have an attorney present during questioning the accused "has indicated that he considers himself unable to deal with the pressures of custodial interrogation without legal assistance." *People v. Hicks*, 132 Ill. 2d 488, 494 (1989); see also *People v. Baker*, 253 Ill. App. 3d 15, 32-33 (1993); *People v. Schuning*, 399 Ill. App. 3d 1073, 1082 (2010); *People v. Fierstine*, 2019 IL App (5th) 180264, ¶ 13. " 'In the absence of such a bright-line prohibition, the authorities through "badger[ing]" or "overreaching"—explicit or subtle, deliberate, or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.' " *Baker*, 253 Ill. App. 3d at 33 (quoting *Smith v. Illinois*, 469 U.S. 91, 98 (1984)); see also *Schuning*, 399 Ill. App. 3d at 1082; *Fierstine*, 2019 IL App (5th) 180264, ¶ 13. As such, where

an accused has invoked his right to an attorney during police questioning, rather than solely his right to remain silent, and assuming there is no break in custody, "his later waiver of the right to counsel upon police-initiated reinterrogation will not be given legal cognizance." *Baker*, 253 Ill. App. 3d at 33; see also *Schuning*, 399 Ill. App. 3d at 1082; *Fierstine*, 2019 IL App (5th) 180264, ¶ 15. Instead, any statements made afterwards will be presumed to be involuntary and will be inadmissible as substantive evidence at trial. *Winsett*, 153 Ill. 2d at 349; *Schuning*, 399 Ill. App. 3d at 1082; *Fierstine*, 2019 IL App (5th) 180264, ¶ 15.

¶ 83    However, for this rigid bright-line rule to apply, the accused must actually invoke his right to counsel. *Fierstine*, 2019 IL App (5th) 180264, ¶ 16; see also *Davis v. United States*, 512 U.S. 452, 458 (1994) (citing *Smith*, 469 U.S. at 95). To do so, an accused must express his desire for the presence of counsel "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Id*. If the accused's statement "is ambiguous or equivocal *** in light of the circumstances" the rule does not apply, and the officers may continue questioning the suspect." *Id.*

¶ 84    Moreover, even if an accused clearly invokes his right to counsel, he may subsequently waive that right by initiating further communications, exchanges, or conversations with the police. *People v. Coleman*, 2021 IL App (1st) 172416, ¶ 95. When the accused reinitiates contact after an invocation of the right to counsel, the burden remains on the State to show that subsequent events indicated a waiver of the right to have counsel present. *Id* (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983). Reinitiation only occurs when the accused, not the police, reopens dialogue with the authorities. *Coleman*, 2021 IL App (1st) 172416, ¶ 95; *Edwards*, 451 U.S. at 486, n. 9.

¶ 85    This determination involves a two-part inquiry. *Coleman*, 2021 IL App (1st) 172416, ¶ 96. First, the State must show that the accused initiated the conversation in a manner evincing a

willingness and desire for generalized discussion about the investigation. *Id*.; see also *Hicks* 132 Ill. 2d at 493. Second, the court must determine whether the accused voluntarily, knowingly, and intelligently waived his right to counsel. *Id*.

¶ 86    To be voluntary, the waiver must be free and deliberate, and not "the product of intimidation, coercion or deception." *Soto*, 2017 IL App (1st) 140893, ¶ 69. To be knowing, the waiver must be "made with full awareness of the nature of the rights being waived and the resulting consequences of those rights." *Id*. In other words, while an accused need not know and understand all the far-reaching legal and strategic effects of waiving his rights or appreciate how widely or deeply an interrogation may probe, he must at least understand basically what those rights encompass and minimally what their waiver will entail. *People v. Braggs*, 209 Ill. 2d 492, 514-15 (2003).

¶ 87    This determination will depend on the totality of circumstances in each case. *People v. Bowman*, 335 Ill. App. 3d 1142, 1152 (2002). Relevant factors that may be considered include: the accused's age, intelligence, education, experience, background, mental capacity, and physical condition at the time of the interrogation; the duration of the interrogation; whether the accused received *Miranda* warnings prior to giving the statement; whether physical or mental abuse was employed against him; and the legality of his detention. See *People v. Nicholas*, 218 Ill. 2d 104, 118 (2005); see also *Buschauer*, 2022 IL App (1st) 192472, ¶ 65.

¶ 88    Where it appears from the totality of the circumstances that the accused's will to remain silent was inappropriately overborne, the statement will be deemed involuntary. *Id*.; see also *Bowman*, 335 Ill. App. 3d at 1153 (A confession is involuntary where "the defendant's will was overborn *** so that the confession cannot be deemed the product of a rational intellect of free

will.").

¶ 89 In the instant case, in his affidavit, the petitioner alleged that during his custodial interrogation he experienced numerous seizures, which made it impossible for him to concentrate on what was being said and that he repeatedly informed the detectives that he both needed medical treatment and wished to speak to an attorney before talking to them. The petitioner therefore asserts that he clearly invoked his right to counsel and that any statements he made to police afterwards were therefore presumptively involuntary. We agree.

¶ 90 According to the petitioner's uncontested affidavit, after waiting inside the police station interview room for about an hour and experiencing a seizure, the petitioner told Detective Odomos that he was not feeling well and "would need to do this another day." Detective Odomos was aware that on the previous day, the petitioner was hospitalized for a seizure so severe that it caused him to crash his car. Detective Odomos, however, informed the petitioner that he needed to wait for additional detectives to arrive and locked him in the room again. The petitioner attested that while waiting, he continued to have mild seizures. When the additional detectives arrived, the petitioner felt weak and sick and had difficulty focusing on what was being said. The petitioner further averred that after being *Mirandized*, he inquired whether he needed to answer any questions without his attorney. Once he was advised that he did not, the petitioner explicitly told the detectives that he had nothing to say to them without his lawyer being present.

¶ 91 According to the petitioner's affidavit, however, Detective Lara subsequently entered the interview room and told the petitioner that he wanted to ask him some basic questions for which he did not need an attorney. The petitioner again reiterated that he did not wish to speak to the detective and that he needed medical treatment because he continued to have seizures and could "barely stay alert." According to the petitioner, however, despite these requests, Detective Lara

29

neither stopped the interview to wait for the petitioner's counsel, nor called for a physician. Instead, he told the petitioner that he would get medical treatment "as soon as [he] cooperated," with the police. Detective Lara subsequently locked the petitioner in the interview room again.

¶ 92    In his affidavit, the petitioner further attested that after being transported to the lockup, he had another seizure during which he lost consciousness and for which he had to be transported to the hospital for treatment. In support, the petitioner attached medical records confirming his treatment for this seizure and for the one he experienced the previous day when he crashed his car in Oak Park, and of which Detective Odomos was made aware.

¶ 93    Based on the totality of these circumstances, and taking as we must the unrebutted and well-pleaded allegations in the petition as true, we are compelled to conclude that the petitioner made a substantial showing that any statements he made to Detective Lara were made involuntarily. The petitioner demonstrated both that he clearly invoked his right to counsel and that despite his diminished mental capacity resulting from his ongoing seizures, the police deliberately ignored his repeated requests for medical treatment in an attempt " 'to wear [him] down *** and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance.' " *Baker*, 253 Ill. App. 3d at 33 (quoting *Smith v. Illinois*, 469 U.S. 91, 98 (1984)); see also *Schuning*, 399 Ill. App. 3d at 1082; *Fierstine*, 2019 IL App (5th) 180264, ¶ 13; *Bowman*, 335 Ill. App. 3d at 1153 (A statement will be deemed involuntary where a suspect's will is "overborn" in such a manner that the statement "cannot be deemed the product of a rational intellect or free will.").

¶ 94    Nothing in the record suggests that the petitioner reinitiated communication with the police once Detective Lara entered the interview room. Nor does the record positively rebut the petitioner's averment that because of his diminished mental capacity caused by the repeated

30

seizures he was having while in custody, he could not knowingly waive his *Miranda* rights nor his original request for the presence of counsel. At trial, Detective Lara testified that after he entered the interview room, he read the petitioner his *Miranda* rights from a preprinted card but admitted that he could not recall whether he had the petitioner sign a waiver form. The detective further acknowledged that after he spoke with the petitioner, he never asked him to memorialize his statement (in writing or any other format) or to review the detective's notes. What is more, the detective was never asked and therefore never testified about the petitioner's medical condition or whether the petitioner requested the presence of an attorney during this interview. See *Simms*, 2021 IL App (1st) 161067-B, ¶ 35 ("recognizing the existence of a conflict with the trial evidence is not the same as finding that the *** evidence is positively rebutted").

¶ 95    Under this record, we conclude that a motion to suppress based on a *Miranda* violation would have had merit. Accordingly, we fail to perceive any strategic reason for counsel's failure to file one.

¶ 96    In this respect, we strongly disagree with the State's assertion that counsel chose not to file the motion because the petitioner's statements were exculpatory (or as she indicated to the petitioner "harmless") and because she intended to use them as evidence of the petitioner's cooperation with the police.

¶ 97    While it is true that according to Detective Lara, in his statement to police, the petitioner denied any involvement in Robert's shooting, the remainder of his statement undeniably provided the police with key and detailed evidence of his motive to shoot Robert and placed him at the scene of the crime minutes before the shooting occurred. At trial, Detective Lara testified that during his interview with the petitioner, the petitioner told him that he was with Robert the day before the shooting because Robert had helped him open his vehicle after he had locked himself out.

According to the petitioner's statement to the police, for that purpose Robert brought pry tools, but the petitioner refused to let him use them because he did not want his car damaged. While there, Robert noted the car radio faceplate and observed the petitioner place drugs inside his car. According to the petitioner's statement to Detective Lara, when he subsequently discovered that his radio faceplate and drugs were missing, he immediately assumed that Robert had taken them because Robert had seen where he had placed the drugs and the "pry marks" on the petitioner's car were exactly where Robert had intended to use his tools to open it. The petitioner also told the detective that on the morning of the shooting, he went to confront Robert at his garage and to demand his drugs and radio back.

¶ 98    While Marco similarly testified that on the morning of the shooting, the petitioner was seeking out Robert because he believed that Robert had stolen his radio, the petitioner's statement to the police provided the only evidence that the petitioner had sold drugs to Robert in the past and that on the morning of the shooting he believed that Robert had stolen his drugs. Accordingly, the petitioner's statement not only corroborated the State's theory of what happened to cause the petitioner to seek out Robert but provided the much stronger motive that the shooting was driven by Robert's theft of the petitioner's drugs.

¶ 99    What is more, the State's own repeated reliance on the petitioner's statement to the police to establish the petitioner's drug-theft related motive, and to corroborate the often-inconsistent testimonies of Robert and Marco, demonstrates both the statement's inculpatory nature and how crucial it was to the State's case. As the State's rebuttal closing argument reveals:

"The [petitioner] according to his own words to the police is a drug dealer and has sold

32

drugs to Rob[ert].

* * *

Once the [petitioner] is arrested, he speaks to police. And that is how you know for a fact that Rob[ert] and Marco *** are telling the truth because just about every single thing the [petitioner] tells the police is exactly what Rob[ert] and Marco told the police and what they told you.

* * *

The [petitioner] tells the police I hid drugs under the dashboard. That's what Rob[ert] said. *** [T]hen the [petitioner] gives information to the police that only the [petitioner] would know[,] which is that he went back to his car and the drugs[,] *** were missing. So, the [petitioner] believes that Rob[ert] stole his stuff, and he tells the police that. I believe Rob[ert] *** stole my stuff, so I went looking for him. Those are his words. That is what [the petitioner] told the police. That's what we call motive, ladies, and gentlemen.

* * *

[H]ow convenient that every single thing that [the petitioner] told the police is exactly what Robert *** told the police except for that last little part, the part about trying to kill him. The other extremely telling piece of information that proves the [petitioner] is guilty is that according to his own words he puts himself at the scene of the shooting the day of the shooting with Rob[ert] ***. The [petitioner] tells police, I went looking for him. I found Rob[ert] at 14th and Tripp. I said to him, I want my stuff back. And [Robert] said, I don't know what you're talking about. Get away from me. He puts himself there. *The [petitioner] essentially confessed to this crime* and brings himself all the way up to the

33

point of the shooting."

¶ 100 Since it is apparent from the prosecutor's comments that the State itself deemed the petitioner's statement to the police to be "essentially" a confession, we find disingenuous the State's present argument that trial counsel chose not to exclude the statement because of its exculpatory nature. We similarly find no merit in the State's suggestion that it was reasonable for counsel to permit the State to introduce the petitioner's statement at trial because it evidenced his cooperation with the police. Nothing prevented counsel from arguing that the petitioner was an innocent person because he cooperated with the police without the introduction of his statement to Detective Lara. There was ample evidence offered at trial that the petitioner reached out to Detective Odomos, agreed to meet with him at the gas station, and made no attempt to flee when the detective placed him into custody. In fact, Detective Odomos explicitly testified that throughout his investigation the petitioner remained cooperative "at all times."

¶ 101 Moreover, we further find that but for counsel's omission, there is a reasonable probability that the outcome of the petitioner's proceedings would have been different. Contrary to the State's position, the evidence at the petitioner's trial was far from overwhelming. Without the petitioner's admission to having a strong motive to shoot Robert and to having been with Robert at the scene of the crime immediately prior to the shooting, the only evidence connecting the petitioner to the crime came from two unreliable witnesses, one of whom was an admitted heroin addict and the other who was a convicted drug dealer. Moreover, both eyewitnesses provided conflicting identifications of the shooter and admitted that at some point they told the authorities that they neither recognized the shooter, nor could identify him because he wore a mask. In addition, the eyewitness's ability to see the shooter was challenged at trial, with Robert admitting that he never saw the shooter before he was shot, and Marco acknowledging that he observed the entire incident

either from a "crack" in the lifted hood of his truck or from the passenger-side mirror. Finally, Robert admitted that he testified at the petitioner's trial only because a subpoena was issued for his arrest. Under this record, we believe that had counsel filed a motion to suppress the petitioner's incriminating statements, the State would have been prevented from: (1) establishing that the shooting was motivated by Robert's theft of the petitioner's drugs; (2) corroborating that the petitioner went to see Robert on the morning of the shooting; and (3) arguing that the petitioner as good as confessed to the crime. Absent this evidence, there was a reasonable probability that the outcome of the petitioner's trial would have been different. Se *Evans*, 209 Ill. 2d at 220 ("a reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome").

¶ 102   Accordingly, we conclude that the petitioner has made a substantial showing of trial counsel's ineffectiveness based on counsel's failure to file a motion to suppress.

¶ 103   2. Failure to Subpoena Police and Medical Records Regarding His Medical Condition

¶ 104   For these same reasons, we further find that counsel's failure to subpoena the petitioner's medical records and the Oak Park Police records demonstrating his medical condition prior to and on the day of his interrogation constitute ineffective representation.

¶ 105   In his affidavit, the petitioner averred that he informed his counsel about having seizures prior to and during his interrogation. He told counsel that the day before he made his statement to police, he had a seizure so severe that he lost consciousness and crashed his car in Oak Park, for which he was arrested and subsequently treated at Loretto Hospital, and of which Detective Odomos was informed. Both the Oak Park police records and the Loretto Hospital medical records, attached to the petition, confirm that the petitioner suffered from a seizure disorder, and that he experienced a severe seizure just one day before he was arrested by Detective Odomos. The

35

petitioner also informed counsel of the mild seizures he continued to have during his custodial interrogation. He also told counsel that while in lock up, he was hospitalized after he lost consciousness from another seizure. Medical records from this hospital, also attached to the petition, confirm that the petitioner experienced seizures during his time in police custody.

¶ 106   While generally counsel's decisions to subpoena medical and police records are matters of trial strategy (*People v. Johnson*, 143 Ill. App. 3d 34 (1986)), where counsel was aware that the petitioner suffered seizures, for which he was hospitalized prior to and while in police custody, and that this impacted his ability to voluntarily, knowingly, and intelligently waive his *Miranda* rights, we find no strategic reason for her failure to obtain them. It is undeniable that the introduction of such records would have supported a motion to suppress the petitioner's inculpatory statements to police, without which, as already discussed above, there was a reasonable probability that the outcome of the petitioner's proceedings would have been different. Accordingly, because counsel's failure to subpoena these records prejudiced the petitioner, we find that the petitioner has made a substantial showing of counsel's deficient performance. See *Domagala*, 2013 IL 113688, ¶ 36.

¶ 107        3. Failure to Subpoena Police Records Regarding the Car Radio

¶ 108   The petitioner next avers that counsel was similarly ineffective because she failed to subpoena Oak Park police records, which would have demonstrated, that contrary to Detective Lara's testimony, the petitioner's car radio was never stolen. According to the petitioner, these police records establish that when he crashed his car in Oak Park, he was in possession of the radio faceplate, whose alleged theft by Robert motivated the shooting. We disagree.

¶ 109   In his affidavit the petitioner alleged that his radio was never stolen and that at the time Robert helped him open his car, the radio was in the trunk because he was taking it to be repaired.

The petitioner further alleged that, contrary to Marco's testimony at trial, he never accused anyone of stealing his radio. Even if we take the petitioner's unrebutted and well-pleaded allegations as true, the petitioner cannot demonstrate that the radio faceplate found in his car on March 1, when he was arrested by the Oak Park police department after suffering from a seizure and crashing his car, is the same faceplate that he allegedly had in his trunk on February 18, prior to the shooting. Because in that two-week period, the petitioner was not under arrest, he was free to replace the faceplate with a new one even if it had been stolen by Robert. Accordingly, the petitioner has not made a substantial showing that this portion of the Oak Park police records had the potential to change the outcome of his trial. See *Henderson*, 2013 IL 114040, ¶ 11 (Failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel); see also *Patterson*, 217 Ill. 2d at 438.

¶ 110          4. Failure to Investigate and Present Alibi Witness Testimony

¶ 111   On appeal, the petitioner next contends that counsel was ineffective because she failed to investigate, interview, and present Belinda's alibi witness testimony. He claims that had counsel sufficiently investigated Belinda and presented her alibi testimony at his trial there was a reasonable probability that the outcome of his proceedings would have been different.

¶ 112   The State, on the other hand, responds that because counsel was aware of Belinda's potential alibi testimony and chose not to present her as a witness at trial, we must presume that her choice was strategic. Furthermore, according to the State, because Belinda's alibi testimony would have been inconsistent with the petitioner's statement to Detective Lara, presenting an alibi defense would have harmed counsel's overall trial strategy, *i.e.*, showing the petitioner's innocence based on his cooperativeness with the police. For the following reasons, we disagree with the State.

¶ 113   While typically counsel's decisions concerning which witnesses to call are matters of trial

37

strategy and are immune from ineffective assistance of counsel claims (*People v. Wilborn*, 2011 IL App (1st) 09802, ¶ 79), such strategic decisions "may be made only after there has been a 'thorough investigation of law and facts relevant to plausible options.' " *People v. Gibson*, 244 Ill. App. 3d 700, 703-04 (quoting *Strickland*, 466 U.S. at 690). Trial counsel has a professional duty to conduct "reasonable investigations or make reasonable decisions that make[] particular investigations unnecessary." *Domagala*, 2013 IL 113688, ¶ 38. This duty derives from counsel's basic function "to make the adversarial testing process work in the particular case." *Strickland*, 466 U.S. at 690. The duty includes the obligation to independently investigate any possible defenses. *Kokoraleis*, 159 Ill. 2d at 328 (the duty to investigate possible defenses is a "subset" of defense counsel's overall obligations).

¶ 114   "Where the record establishes that counsel had reason to know, from an objective standpoint, that a possible defense [such as an alibi defense] was available, failure to investigate fully can constitute ineffective assistance of counsel." (Internal citations and emphasis omitted.) *Brown v. Sternes*, 304 F. 3d 677, 692 (7th Cir. 2002); see *e.g.*, *People v. Bolden*, 2014 IL App (1st) 123527, ¶ 38 (holding that defense counsel's failure to investigate and contact alibi witnesses constituted objectively unreasonable assistance); *People v. Brown*, 336 Ill. App. 3d 711 (2002) (same).

¶ 115   In assessing the reasonableness of an attorney's investigation:

"a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming [trial counsel] limited the scope of [her] investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision ***. Rather, a reviewing court must consider the reasonableness of the

investigation said to support that strategy." *Wiggins v. Smith*, 399 U.S. 510, 527 (2003).

¶ 116 Accordingly, where "trial counsel's investigation of a potential alibi defense" is "unreasonably limited" trial counsel's decision not to present an alibi defense is "too-ill-informed to be considered reasonable." *Stitts v. Wilson*, 713 F.3d 887, 891 (7th Cir. 2013).

¶ 117 Moreover, even where counsel conducts a thorough investigation, failure to present exculpatory evidence of which she is aware is objectively unreasonable. See *e.g.*, *People v. King*, 316 Ill. App. 3d 901, 913-16 (2000) ("[C]ounsel's tactical decisions may be deemed ineffective when they result in counsel's failure to preset exculpatory evidence of which [s]he is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense."); see also *Brown*, 336 Ill. App. 3d at 718 (same); *People v. Bass*, 2022 IL App (1st) 210249, ¶ 30 ("Where a defendant's attorney is aware of exculpatory evidence and does not present it, counsel can be deemed ineffective").

¶ 118 In the present case, accepting as true the unrebutted facts set forth in the petitioner's affidavit and additional supporting documentation, we find that the petitioner has made a substantial showing that defense counsel was ineffective for failing to investigate and/or present Belinda as an alibi witness. In his affidavit, the petitioner attested that he informed his defense counsel that he had an alibi and that at the time of the shooting (between 10 a.m. and 2 p.m. on February 18) he was with Belinda at the Golden Corral restaurant in Bolingbrook. The petitioner further informed counsel that from there he and Belinda proceeded to the Sportsman's Inn, where they spent the night together. Belinda's affidavit, also attached to the petition, confirms the petitioner's version of events. The petitioner informed counsel that both Belinda and he wished to testify at his trial. In addition, he told counsel that he believed that both the Golden Corral restaurant and the Sportsman's Inn had video surveillance cameras, which could prove his

whereabouts with Belinda at the time of the shooting. The petitioner averred that he asked counsel to obtain this footage, but that counsel refused. Instead, she informed the petitioner that she did not want him to testify at trial and that any testimony that Belinda could offer was not important because she was the petitioner's girlfriend and because they "did not have any receipts to support their testimony."

¶ 119   Under this record, we find that counsel's failure to interview Belinda and investigate the Golden Corral restaurant to determine whether it had surveillance cameras which could establish the petitioner's whereabouts at the time of the crime, rose to the level of ineffective assistance. See *e.g.*, *Wiggins*, 539 U.S. at 525 (where a defendant's alibi was that he was at a nightclub at the time of the shooting, where there are presumably many people, "we cannot fathom a reason" that would justify counsel's decision to interview only a single alibi witness without exploring whether there might be others at the venue who could provide credible alibi testimony."); *Raygoza v. Hulick*, 474 F. 3d 958, 963 (7th Cir. 2007) (finding that counsel acted deficiently where "[h]ad [he] gleaned the information from [the defendant's mother] about the evening party that was easily available for the asking, he would have learned that this was not a case where only the mother was willing to vouch for the defendant's alibi. To the contrary, witnesses both related and unrelated to the [defendant] could have been called.")

¶ 120   Contrary to the State's position, there was nothing strategic about counsel's failure to conduct an adequate investigation under these circumstances. Nothing prevented counsel from arguing that the petitioner had an alibi while simultaneously also advancing the theory that he was innocent because he cooperated with the police. As already discussed above, any issues with the petitioner's alleged statement to Detective Lara would have been resolved by the filing of a motion to suppress. Belinda's exonerating testimony could only have aided the petitioner and provided

him with a much stronger defense than the one offered by counsel at trial.

¶ 121   Moreover, in light of the weak evidence of the petitioner's guilt, there is more than a reasonable probability that but for counsel's failure to investigate and call Belinda as an alibi witness the outcome of the petitioner's trial would have been different. Had the jury been presented with evidence of the petitioner's alibi, it would have had a basis upon which to acquit. See *People v. Makiel*, 358 Ill. App. 3d 102, 109 (2005) (holding that the defendant was entitled to an evidentiary hearing on his claim that counsel was ineffective for failing to subpoena the separately tried codefendant where questions of fact existed as to counsel's failure to investigate and whether failure to call this witness rendered his trial fundamentally unfair where the record reflected no strategic reason for counsel's failure to call the witness and questions of fact could only be resolved by consideration of matters outside of the record); see also *People v. House*, 141 Ill. 2d 323, 386 (1990) (holding that based on the closeness of the evidence, counsel's failure to conduct an investigation that would have established that the victim described someone other than the defendant at the scene, constituted ineffective assistance of counsel, which likely affected the outcome of the defendant's trial); *People v. Coleman* 267 Ill. App. 3d 895, 899 (1994) (holding that counsel's failure to interview witnesses and "pursue information in his possession," which indicated that the crime had been committed differently from what the victim had reported supported the defendant's claim of ineffective assistance of counsel).

¶ 122   Accordingly, we find that the petitioner has made a substantial showing of counsel's ineffectiveness on this basis, and that the dismissal of this claim was improper.

¶ 123        5. Failure to Submit the Negotiated Stipulation of Nurse Szymanski

¶ 124   On appeal, the petitioner next contends that trial counsel was ineffective because she failed to submit the negotiated stipulation of nurse Szymanski. According to the petitioner, Szymanski

would have testified that she spoke with Robert before his surgery, on February 18, 2010, thereby impeaching Detective Lara's testimony and preempting the State's argument that Robert could not make an identification for two days after the shooting because he was intubated and unable to speak. For the following reasons, we disagree.

¶ 125   At the outset, the State concedes that although counsel's failure to introduce nurse Szymanski's stipulation into the record was already discussed during trial, in the petitioner's posttrial motion, and on direct appeal, because that stipulation was never entered into the record, *res judicata* does not bar us from considering this issue now. See *Tate*, 2012 IL 11214 (issues that were raised on direct appeal are procedurally barred under the doctrine of *res judicata*). While the petition does not include the actual stipulation, it attaches APD Clough's affidavit, which corroborates her averments regarding the stipulated content, such that the content is properly before this court and part of the record for the first time. Accordingly, in the absence of an objection from the State, we evaluate the merits of the petitioner's claim.

¶ 126   "It is unequivocal that the use of stipulations, in and of itself, does not establish ineffective assistance of counsel." *People v. Coleman*, 301 Ill. App. 3d 46 (1998). Nonetheless, an untrue stipulation or one entered erroneously may amount to deficient representation. *Id*. at 47.

¶ 127   Here, the petitioner argues that because during jury deliberations defense counsel herself acknowledged that she made a mistake in not entering the negotiated stipulation, the record affirmatively shows that her performance was deficient.

¶ 128   Initially, we disagree with the petitioner's characterization of the record. While it is true that during jury deliberations defense counsel acknowledged that in hindsight, she should have entered the stipulation into the evidence, later while making this same argument at the hearing on her motion for a new trial, counsel expressly stated that she was "obviously" not alleging her own

ineffectiveness.

¶ 129 Regardless, even if we presume that counsel's performance was constitutionally inadequate, the petitioner has failed to make a substantial showing that he was prejudiced by counsel's conduct. See *Henderson*, 2013 IL 114040, ¶ 11 (Failure to establish either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel).

¶ 130 Had Szymanski's stipulation been entered into the evidence there is no reasonable probability that the outcome of the petitioner's trial would have been different. *Evans*, 209 Ill. 2d at 220. The Szymanski stipulation would merely have suggested that Robert was able to speak to hospital personnel about his treatment before he was able to speak to police and identify the petitioner as his assailant. Nothing in that stipulation would have established that the petitioner spoke to police but was unable to identify the petitioner as the shooter. Nor would it have contradicted the State's subsequent argument that Robert identified the petitioner to the police as soon as he could, *i.e.*, when he was no longer intubated and could speak. Accordingly, we find that the petitioner has failed to establish counsel's ineffectiveness on this basis.

¶ 131 In coming to this conclusion, we have considered the decision in *People v. Meija*, 247 Ill. App. 3d 55 (1993) cited by the petitioner and find it inapposite. There, the State's case against the defendant consisted of the testimony of two "sole eyewitnesses to what transpired" and there were police reports that reveled "that they perhaps witnessed nothing." *Id*. at 65. While defense counsel was aware of three witnesses whose testimony could completely impeach the two eyewitness accounts, instead of calling them to testify, he stipulated to their testimony. *Id*. On appeal, we found that counsel was constitutionally deficient because his "failure to exact full mileage from the impeaching police reports seriously undermined the adversarial process[.]" *Id*. at 65-66.

¶ 132 In the present case, unlike in *Meija*, Szymanski's stipulation could not have directly

impeached Robert's identification of the petitioner as the shooter. Whether Robert made that identification on the day of the shooting or two days after he was treated at the hospital, was irrelevant and could not have made a difference to the outcome of the petitioner's trial. Accordingly, *Meija* does not apply.

¶ 133       6. Submission of Confusing and Irrelevant Stipulation by Dr. Sullivan

¶ 134   The petitioner next contends that counsel was ineffective because she agreed to the submission of the often "confusing and irrelevant medical stipulation" of Robert's treating surgeon, Dr. Sullivan, which described in minutia every single procedure performed on Robert upon his arrival at the hospital on February 18. According to the petitioner, counsel failed to realize that Dr. Sullivan's stipulated testimony significantly undercut Robert's and Marco's version of the shooting. Robert and Marco both testified that the petitioner first shot Robert in the pelvis, and then in the chest while Robert was lying on the ground. According to the petitioner, however, Dr. Sullivan's stipulated testimony regarding the entrance and exit wounds conclusively established that because the bullet entered just below the right nipple, traveled downward, and exited the lower back, the petitioner could not have shot Robert while Robert was lying on the ground, but rather must have shot him a second time while he was still standing.

¶ 135   We initially disagree with the petitioner's interpretation of Dr. Sullivan's stipulated testimony. Dr. Sullivan's stipulation nowhere explicitly states that the bullet that entered Robert's chest just below the right nipple traveled downward. Moreover, nothing in that stipulation suggests, let alone establishes that even if the bullet travelled downward, such a trajectory would be impossible if the petitioner were standing over Robert. Such an argument is mere conjecture.

¶ 136   However, even presuming that the petitioner's interpretation is correct, and that counsel failed to realize the significance of Dr. Sullivan's testimony, the petitioner has failed to make a

substantial showing that counsel's failure to call Dr. Sullivan as a witness instead of agreeing to the submission of the stipulation, had the potential to change the outcome of his trial. See *Henderson*, 2013 IL 114040, ¶ 11. Nothing in Dr. Sullivan's testimony would have negated that the petitioner shot Robert twice at close range or that as a result Robert suffered serious injuries, including a hemothorax, a grade 4 liver injury, a left femur fracture and a 4 cm rent in his diaphragm. Whether the second shot came in quick succession as Robert was still standing or after he fell to the ground, the evidence of two close-range shots was more than sufficient to permit the jury to find the petitioner guilty of attempted murder. Accordingly, because the petitioner has failed to establish prejudice, we conclude that he cannot succeed on an ineffectiveness of counsel claim on this basis. See *Henderson*, 2013 IL 114040, ¶ 11.

¶ 137   7.  Failure to Perfect Marco's Impeachment with Police Records or the Testimony of
Officer Montes and Failure to Request a Jury Instruction

¶ 138   The petitioner next contends that counsel was ineffective for failing to perfect Marco's impeachment and by failing to request that the jury be properly instructed on prior inconsistent statements. Specifically, the petitioner claims that Officer Montes' police report directly contradicts Marco's testimony in two relevant. First, while Marco testified that he heard three or four gunshots inside the garage, the police report quotes him as saying that the shooter fired two shots. Second, although Marco testified that he watched the entire crime through the gap between his upraised hood and the dashboard of his truck, according to the police report, he told Officer Montes that he watched the incident in his side view mirror. The petitioner therefore argues that Officer Montes' police report could have been used on cross-examination to challenge Marco's credibility and introduced as substantive evidence of his prior inconsistent statements. The petitioner therefore argues that counsel's decision not to introduce this police report or to call

Officer Montes as a witness constituted ineffective representation.

¶ 139   In addition, the petitioner asserts that there was a danger of the jury being confused and unsure about how counsel's unverified attempts to impeach Marco regarding these two facts should be considered. The petitioner contends that counsel should have requested that the jury be instructed on prior inconsistent statements because the instruction given failed to inform them that the believability of a witness could be challenged by evidence of  prior inconsistent statements. For the following reasons, we disagree.

¶ 140   It is axiomatic that the purpose of impeaching evidence is to attack the credibility of a witness and not to establish the truth of the impeaching evidence. *Robinson*, 2020 IL 123849, ¶ 69 (citing *People v. Bradford*, 106 Ill. 2d 492, 499 (1985)). Counsel's decision on whether and how to cross-examine or impeach a witness is generally a matter of trial strategy, which will not by itself support a claim of ineffective assistance of counsel. *People v. Bell*, 2021 IL App (1st) 190366, ¶ 79; *People v. Salgado*, 263 Ill. App. 3d 238, 246 (1994). When assessing the importance of the failure to impeach for purposes of *Strickland*, "the value of the potentially impeaching material must be placed in perspective." *People v. Jimerson*, 127 Ill. 2d 12, 33 (1989); see also *Salgado*, 263 Ill. App. 3d at 246-47; *People v. Layton*, 2021 IL App (1st) 172418, ¶ 86.

¶ 141   In addition, the failure to request specific jury instructions constitutes ineffective assistance only when such failure was not the result of trial strategy. *People v. Gill*, 355 Ill. App. 3d 805, 811 (2005). *People v. Falco*, 2014 IL App (1st) 111797, ¶ 16. Decisions regarding choice of jury instructions generally enjoy a strong presumption that they reflect sound trial strategy, rather than incompetence, and are thus immune from claims of ineffective assistance of counsel. *Falco*, 2014 IL App (1st) 111797, ¶ 16. Failure to request a particular jury instruction

may be grounds for a finding of ineffective assistance of counsel only where the instruction was so critical to the defense that its omission denied the petitioner his right to a fair trial. *Id.*

¶ 142   In the instant case, the petitioner has failed to rebut the presumption that counsel's decision not to call Officer Montes or use his police reports to impeach Marco was anything but trial strategy. The record reveals that on cross-examination, counsel thoroughly questioned Marco regarding the inconsistencies in his original statement to Officer Montes and his subsequent testimony at trial. Counsel got Marco to admit that he told Officer Montes that he could not provide a description of the shooter because the shooter was unknown to him and because he was wearing a mask. Counsel also got Marco to admit that he did not tell the police about the threat the petitioner had made against his father earlier in the day because he believed it to be untrue.

¶ 143   Counsel had no strategic reason to introduce Officer Montes' police report in response to the petitioner's testimony regarding how many shots he "believed" were fired, because that report would have only supported the State's theory of the case that the petitioner fired two shots. Similarly, counsel had no strategic reason to introduce Marco's prior inconsistent statement regarding his ability to view the shooting. At trial, counsel already got Marco to admit that he never told Officer Montes that he saw the shooting through a crack in the raised hood of his truck but instead watched it through his passenger side mirror. Since counsel already impeached Marco on this issue, it was reasonable for her to believe that the introduction of Officer Montes' police report or testimony would be redundant and therefore unnecessary.

¶ 144   For these same reasons, we conclude that counsel's decision not to include a jury instruction regarding prior inconsistent statements did not rise to the level of ineffective

representation. In the instant case, the jury was instructed in the following manner:

"Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them. In considering the testimony of any witness, you may take into account his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias, or prejudice he may have, drug usage, and the reasonableness of his testimony considered in the light of all the evidence in the case."

¶ 145   Contrary to the petitioner's contention, this instruction sufficiently informed the jury that they were the arbiters of the witnesses' credibility. Specifically, the instruction stated that in considering a witness's believability, the jury should consider a witness's "memory" and the "reasonableness" of his testimony in light of the other evidence offered at trial. Because the jurors here certainly heard evidence that Marco lied to the police about the most crucial piece of evidence necessary to the State's case, *i.e.*, the identity of the shooter, they could evaluate his testimony regarding the number of shots fired and the position from which he observed the shooting in context of that evidence and in determining his overall credibility. There is nothing that the petitioner's proposed jury instruction would have added to the jury's understanding of credibility that could have changed the result of his trial. Accordingly, we find that the petitioner's contention of ineffective assistance of counsel on this basis must fail. See *Falco*, 2014 IL App (1st) 111797, ¶ 16  (where a jury instruction is not so critical to the defense that its omission denies the petitioner his right to a fair trial, counsel's failure to request the instruction does not rise to the level of ineffective representation).

¶ 146          8. Failure to Object to the Firearm Enhancement Under *Apprendi*

¶ 147   In his final complaint regarding counsel's performance, the petitioner contends that counsel was ineffective because she failed to challenge his 25-year firearm sentencing enhancement under

*Apprendi*, 530 U.S. 466. Specifically, the petitioner contends that because his indictment did not include any allegations regarding his personal discharge of the firearm, counsel was ineffective for failing to object to the enhancement or to request a separate jury instruction or verdict form on the enhancement be presented to the jury.

¶ 148    The State initially responds that this claim is forfeited because the petitioner could have but did not raise it on direct appeal. See *English*, 2013 IL 112890, ¶ 22 (issues that could have been raised on direct appeal, but were not, are forfeited). In doing so, the State points out that the petitioner cites to nothing in the record, which was unavailable to him at the time of his direct appeal, and which would have prevented him from raising this ineffective assistance of counsel claim. The State therefore argues that the only way we can consider this claim is in the context of the petitioner's claim of ineffective assistance of appellate counsel for failing to argue trial counsel's deficiency. Because in his reply brief, the petitioner does not object to this characterization of his claim, we address it in that context.

¶ 149    It is well-settled that "[c]laim[s] of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel." *People v. Childress*, 191 Ill. 2d 168, 175 (2000). Accordingly, to succeed under on a claim of ineffective assistance of appellate counsel, under *Strickland*, the petitioner was required to make a substantial showing that appellate counsel's failure to raise the aforementioned issue on direct appeal was both: (1) objectively unreasonable and (2) that it prejudiced him. *Childress*, 191 Ill. 2d at 175 (citing *People v. West*, 187 Ill. 2d 418, 435 (1999)).

¶ 150    Our courts have repeatedly held that "[a]ppellate counsel is not obligated to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently

wrong." *People v. Easley*, 192 Ill. 2d at 329. Accordingly, "[u]nless the underlying issue is meritorious, petitioner suffer[s] no prejudice from counsel's failure to raise [the issue] on direct appeal." *Childress*, 191 Ill. 2d at 175.

¶ 151   For the following reasons, we find that the petitioner has failed to make a substantial showing of an *Apprendi* violation, and that therefore appellate counsel had no obligation to raise this ineffective assistance of trial counsel claim.

¶ 152   In *Apprendi,* the United States Supreme Court held that any facts that increase the prescribed penalties for an offense must be submitted to a jury and proven beyond a reasonable doubt. See *Apprendi*, 530 U.S. at 490; see also *People v. Aguilar*, 396 Ill. App. 3d 43, 59 (2009). The petitioner here was sentenced to 15-years imprisonment on the attempted murder charge (720 ILCS 5/9-1(a)(1) (West 2010) and an additional 25-years imprisonment for having personally discharged the firearm that injured Robert (720 ILCS 5/8-4(c)(1)(D) (West 2010)). Because the total 40-year sentence imposed was greater than the maximum for attempted first degree murder (*i.e.*, 30 years) (730 ILCS 5/5-8-1(a)(3) (West 2010), under *Apprendi* the jury had to find the facts of the sentencing enhancement, (*i.e.*, that the petitioner personally discharged the firearm that injured Robert) beyond a reasonable doubt.

¶ 153   Contrary to the petitioner's contention, however, the jury here did make that determination. The jury was given an issues instruction, which explicitly stated that in order to find the petitioner guilty of the offense of attempted first degree murder, they would have to find that the State proved beyond a reasonable doubt:

"First: That the [petitioner] performed an act which constituted a substantial step toward the killing of Robert Richardson; and

Second: That the [petitioner] did so with the intent to kill Robert Richardson; and

> Third: That during the commission of the offense of attempt first degree murder, the [petitioner] *personally discharged a firearm that proximately caused great bodily harm to Robert Richardson.*" (Emphasis added)."

Because after its deliberations the jury submitted a guilty verdict form finding the petitioner guilty of attempted first-degree murder, the application of the sentencing enhancement fulfilled the requirements of *Apprendi,* and appellate counsel was not ineffective for failing to make that argument on appeal. See *e.g*., *Aguilar*, 396 Ill. App. 3d at 60 (2009) ("Because the instructions provided to the jury at defendant's trial included the language 'personally discharging firearm' and properly articulated the facts that were required to be proven beyond a reasonable doubt in order to apply the 25-year extension to defendant's sentence, the enhancement did not violate *Apprendi*"); *People v. Hopkins*, 201 Ill. 2d 26, 39-40 (2002) (finding no *Apprendi* violation where the defendant was sentenced to an extended term sentence due to the victim's age, despite the fact that the jury did not receive a separate instruction on the issue).

¶ 154   The petitioner nonetheless asserts that trial counsel was ineffective for failing to request a separate verdict form for the sentencing enhancement because that "left the jury with no mechanism" to decide the petitioner's guilt or innocence solely as to the enhancement and separately from their guilty finding on the attempted murder charge. We disagree.

¶ 155   Given that the unrebutted testimony at the petitioner's trial established that there was only one shooter and that trial counsel's entire defense rested on challenging that shooter's identity, trial counsel had no reason to request a separate verdict form on the firearm enhancement. Once a rational jury believed Marco and Robert about the identity of the shooter, there was no reasonable probability that they would have failed to find the firearm enhancement. See *People v. Thurow*, 203 Ill. 2d 352, 368 (2003) (holding that the *Apprendi* error was harmless where it was clear

beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error). Accordingly, we find that the petitioner has failed to establish appellate counsel's ineffectiveness for failing to argue trial counsel's deficiency based on *Apprendi*.

¶ 156    In conclusion, we find that the petitioner has successfully alleged only three instances of trial counsel's deficient performance, namely that counsel failed: (1) to file a motion to suppress his inculpatory statements to the police; (2) to subpoena Oak Park Police records and medical records establishing that he suffered several seizures during his custodial interrogation; and (3) to investigate, interview, and present Belinda's alibi witness testimony. Accordingly, we reverse the circuit court's dismissal of these three claims and remand for further proceedings under the Act. See *Tate*, 2012 IL 11214, ¶ 10 (Where a substantial showing of a constitutional violation is set forth, the petition must be advanced to the third stage for the circuit court to conduct an evidentiary hearing). We, however, find that the petitioner has failed to sufficiently allege the remainder of his ineffective assistance of trial counsel claims, and therefore affirm their dismissal. See *Tate*, 2012 IL 11214, ¶ 10.

¶ 157                          B. Ineffective Assistance of Appellate Counsel

¶ 158    On appeal, the petitioner next asserts that he was denied his constitutional right to the effective representation of appellate counsel. The petitioner contends that appellate counsel was deficient because he: (1) failed to argue trial counsel's ineffectiveness for the same eight reasons already discussed above, and (2) failed to challenge the sufficiency of the evidence used to convict him. For the following reasons, we disagree.

¶ 159    As previously noted, claims of ineffective assistance of appellate counsel are analyzed under the same *Strickland* standard applied to ineffective assistance of trial counsel claims. *Childress*, 191 Ill. 2d at 175. Accordingly, the petitioner here was required to make a substantial

showing that appellate counsel's failure to raise any of his now alleged ineffective assistance of trial counsel claims was: (1) objectively unreasonable under prevailing social norms; and (2) that but for counsel's deficient performance, there was a reasonable probability that the result of his appeal would have been different. *Childress*, 191 Ill. 2d at 175 (citing *West*, 187 Ill. 2d at 435). "A petitioner's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim." *People v. Palmer*, 162 Ill. 2d 465, 475-76 (1994).

¶ 160    As already discussed above, because we have found three of the petitioner's ineffective assistance of trial counsel claims to be meritorious, correspondingly we also conclude that the petitioner has made a substantial showing of appellate counsel's deficient performance for failure to argue those issues on direct appeal. Accordingly, we reverse and remand those three ineffective assistance of appellate counsel claims. Conversely, since we have found that the remaining ineffective assistance of trial counsel claims lacked merit, appellate counsel's decision not to pursue them does not rise to the level of deficient representation and we affirm the circuit court's dismissal on those grounds. *Childress*, 191 Ill. 2d at 175. ("Unless the underlying issue is meritorious, petitioner suffer[s] no prejudice from counsel's failure to raise [the issue] on direct appeal.")

¶ 161    We similarly reject the petitioner's contention that appellate counsel was ineffective for failing to argue the insufficiency of the evidence to convict him on direct appeal.

¶ 162    The standard of review for a challenge to the sufficiency of the evidence is whether after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler* 226 Ill. 2d 92, 114 (2007). The trier of fact is responsible for assessing the credibility of the witnesses, weighing the testimony presented at trial and drawing reasonable inferences from the evidence.

*People v. Hutchinson*, 2012 IL App (1st) 102332, ¶ 27; *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001); *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). A court of review will not substitute its judgment for that of the trier of fact on these questions. *People v. Bradford*, 2016 IL 118674, ¶ 12. We will only reverse a criminal conviction when the evidence is so improbable or unsatisfactory that there remains a reasonable doubt as to the defendant's guilt. *Beauchamp*, 241 Ill. 2d at 8.

¶ 163   In the present case, viewing the evidence at trial in the light most favorable to the State, we are compelled to conclude that a reasonable jury could have found all the elements of the crime beyond a reasonable doubt.

¶ 164   A person commits the offense of attempted (first degree murder) when he, with the specific intent to kill, commits any act that constitutes a substantial step towards the commission of murder. 720 ILCS 5/8-4(a), 9-1(a)(1) (West 2010). A person commits first degree murder when he kills an individual without lawful justification and in performing the acts, which caused the death, he intended to kill or do great bodily harm to that individual. 720 ILCS 5/9-1(a)(1) (West 2010).

¶ 165   In the present case, the evidence at trial established that the petitioner shot Robert twice from close range, in the thigh and in the chest, and that as a result Robert suffered great bodily harm. The petitioner himself does not challenge these facts. Instead, he broadly asserts that Robert and Marco were incredible witnesses because they were impeached and inconsistent, and that as a result appellate counsel should have challenged the sufficiency of the evidence to convict him. As already noted above, however, appellate counsel must have been aware that the jury, as the trier of fact, was responsible for judging witness credibility and that a reviewing court would not be permitted to substitute its judgment for that of the trier of fact on credibility issues. *Hutchinson*, 2012 IL App (1st) 102332, ¶ 27. Accordingly, where, as here, the jury clearly chose to believe

Marco and Robert, even after hearing and weighing the numerous inconsistencies in their testimonies, counsel's decision not to raise a sufficiency of the evidence challenge does not rise to the level of deficient representation. See *Easley*, 192 Ill. 2d at 329 (It is not incompetent for counsel "to refrain from raising issues which, in his or her judgment, are without merit, unless counsel's appraisal of the merits is patently wrong.").

¶ 166   Moreover, any inconsistencies in Marco's and Robert's testimonies did not render the evidence offered at trial so improbable or unsatisfactory to justify reversal. Accordingly, we reject this basis for appellate counsel's ineffectiveness.

¶ 167                                    C. Prosecutorial Misconduct

¶ 168   On appeal, the petitioner next contends that the circuit court erred in dismissing his petition where he made a substantial showing that the State committed prosecutorial misconduct by arguing facts that were not in evidence. According to the petitioner, in closing, the State improperly argued that: (1) Robert could not name the shooter because he was unable to speak to anyone at the hospital; (2) Detective Lara testified to Robert being unconscious; (3) Robert was scared to testify because he was threatened on the street; and (4) the police did not find a murder weapon because the petitioner disposed of it before he was arrested. For the following reasons, we find that these claims are all procedurally barred.

¶ 169   As already noted above, a postconviction proceeding is not a continuation of, or an appeal from, the original case. See *Tate*, 2012 IL 11214, ¶ 8; *English*, 2013 IL 112890, ¶ 22; *Kokoraleis*, 159 Ill. 2d at 328. Accordingly, issues that were raised on direct appeal are *res judicata*, and issues that could have been raised on direct appeal, but were not, are forfeited. *Tate*, 2012 IL 11214, ¶ 8; *English*, 2013 IL 112890, ¶ 22.

¶ 170   At the outset, we note that the petitioner's first three allegations of prosecutorial

misconduct were already thoroughly discussed and rejected by this court on direct appeal. See *Baker*, 2015 IL App (1st) 130016-U, ¶¶ 18-19. Specifically, on appeal, the petitioner argued that the State improperly: (1) "attempted to explain [Robert's] delay in identifying [him] by arguing that [Robert] was intubated and could not speak when the State knew that [Robert] spoke to hospital personnel on the night of the shooting," and (2) argued that Robert failed to come to court because he was threatened, when in fact, the State previously explained to the circuit court that Robert missed court because he did not have his legal papers. *Id.*, ¶¶ 18-19.

¶ 171   The petitioner's instant grievances regarding the State's comments about Robert being threatened on the street, Robert's inability to name the shooter prior to surgery, and Detective Lara's testimony that Robert was unconscious when he first visited him in the hospital, are fundamentally identical to the prosecutorial misconduct claims previously raised on direct appeal. See *Id.*, ¶¶ 18-19.

¶ 172   We already rejected both those arguments, finding that the prosecutor's comments did "not fall outside the wide latitude given to the State during closing argument." *Id*. at ¶ 18. Accordingly, because these issues have already been thoroughly addressed by this court, *res judicata* bars the petitioner from relitigating them. [4] See *Tate*, 2012 IL 11214, ¶ 8; *English*, 2013 IL 112890, ¶ 22.

¶ 173   Moreover, to the extent that the petitioner now challenges additional comments made by the State that were not raised on direct appeal (*i.e*., the State's comments regarding the petitioner's disposal of the murder weapon prior to his arrest), his argument is forfeited because the record was

---

[4] To the extent that the petitioner attempts to circumvent the application of *res judicata* by arguing that because nurse Szymanski's stipulation, which would have established that the State knew the comments regarding Robert being unable to speak at the hospital were false, was never presented at trial and was therefore never part of the record on appeal, we note that in our decision affirming the petitioner's conviction, we specifically held that regardless of the content of that stipulation (about which we refused to speculate), even if the stipulation had been entered into the evidence, the State's comments in closing would have been proper. *Baker*, 2015 IL App (1st) 130016-U, ¶ 19.

available to him at the time of his trial and he does not now make an allegation of ineffective assistance of appellate counsel based on counsel's failure to object to those comments on appeal. See *English*, 2013 IL 112890, ¶ 22 (*Res judicata* and forfeiture may be relaxed in limited circumstances, including "where the forfeiture stems from the ineffective assistance of appellate counsel, or where the facts relating to the issue do not appear on the face of the original appellate record").

¶ 174 Nonetheless even if we were to consider this contention, we would find that it is without merit as the petitioner cannot establish that the comments were improper or that he was substantially prejudiced by them.

¶ 175 It is axiomatic that in closing arguments, prosecutors have a great deal of latitude to comment upon and draw reasonable inferences from the evidence presented. *People v. Blue*, 189 Ill. 2d 99, 127 (2000). In reviewing comments made during closing arguments, we ask whether the comments "engendered substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilty resulted from them." *Wheeler*, 226 Ill. 2d at 123. In determining whether substantial prejudice occurred, the court must consider the context and the content of the language in its entirety, its relationship to the evidence presented, and its effect on the defendant's right to a fair and impartial trial. *People v. Williams*, 333 Ill. App. 3d 204, 214 (2002). A new trial is warranted only if the jury could have reached a contrary verdict had the prosecutor not made the improper comments or if we cannot determine whether the prosecutor's improper remarks contributed to the defendant's conviction. *Id*.

¶ 176 In the present case, contrary to the petitioner's position, the State's comments regarding his disposal of the murder weapon accurately reflected the testimony heard at trial. Specifically, those comments could have been inferred from Robert's and Marco's testimonies that they

observed the petitioner shoot Robert and the fact that the weapon (unlike the shell casings) was not subsequently recovered from the garage. Moreover, even if the comments were improper, because Marco and Robert both identified the petitioner as the shooter, there was no danger of substantial prejudice to the petitioner. *Wheeler*, 226 Ill. 2d at 123.

¶ 177   We therefore find that the circuit court properly dismissed the petitioner's prosecutorial misconduct claims.

¶ 178                                    III. CONCLUSION

¶ 179   In conclusion, for the reasons discussed above, we hold that the petitioner has made a substantial showing of three ineffective assistance of trial and appellate counsel claims. The petitioner established that trial counsel failed: (1) to file a motion to suppress; (2) to subpoena police and medical records relevant to the petitioner's medical condition at the time of his inculpatory statement to the police; and (3) to investigate, interview, and present Belinda's alibi witness testimony. Correspondingly, the petitioner established that appellate counsel was ineffective for failing to raise these three issues on direct appeal. Accordingly, the circuit court's dismissal of these claims must be reversed, and the claims must be remanded for an evidentiary hearing pursuant to the Act. See *Tate*, 2012 IL 11214, ¶ 10 (Where a substantial showing of a constitutional violation is set forth, the petition must be advanced to the third stage for the circuit court to conduct an evidentiary hearing). Because the petitioner has failed to make a substantial showing of any of his remaining claims, we affirm their dismissal.

¶ 180   Affirmed in part; reversed and remanded in part.